# THE STATE v. WILLIAM PYLES, Appellant.

### Division Two, November 19, 1907.

1. **OBJECTIONABLE QUESTION: Unfavorable Answer.** A party cannot sit by and permit a question clearly objectionable on its face to be answered, without objection, and then take the benefit of it if the answer is favorable, or have it stricken out if unfavorable.

2. ————: **Hearsay: Other Objection.** An objection to a question, which calls for hearsay evidence, that it does not prove or disprove any issue in the case, is not equivalent to an objection that it is hearsay. That is no more than saying it is irrelevant and immaterial.

3. **MURDER: Entering Fight.** When parties by mutual understanding engage in a fight, and death ensues to either, the slayer will be guilty of murder, when the combat is not the immediate consequence of a sudden quarrel, but an act of deliberation or agreement.

4. ————: ————: **In Second Degree: Malice: Premeditation.** Ill-feeling had existed between defendant and deceased; defendant in the morning had threatened that the trouble would culminate that night; he had armed himself with a knife and pistol and gone to the church in the evening; when deceased remarked that he was going out of the church to get a drink of water and did go, defendant followed him a few moments later to the well; deceased was totally unarmed; at the well some challenging words were passed, and deceased pushed back his hat and they went to fighting, and deceased struck defendant a time or two, and defendant drew a revolver, which was heard to snap but was not discharged; defendant says he was trying to use it as a club, but that deceased wrenched it out of his hands and tried to shoot him with it, and he then cut him with the knife; the pistol was found within a few feet of where deceased had fallen, as a result of the fatal knife cuts, and there was some evidence that defendant had put it there. *Held*, that it was for the jury to say whether or not the killing was malicious and the result of a premeditated purpose to kill, and a verdict of murder in the second degree is permitted to stand.

Appeal from Carter Circuit Court.—*Hon. William N. Evans,* Judge.

AFFIRMED.

*Herbert S. Hadley,* Attorney-General, and *N. T. Gentry,* Assistant Attorney-General, for the State.

(1)   The information, which is accompanied by the affidavit of the prosecuting attorney, is sufficient in form and substance. Kelley's Crim. Law, sec. 474. Although the information charged murder in the first degree, yet the State had a right, with the permission of the court, to dismiss the greater charge and to prosecute defendant for a lesser offense. State v. Feeley, 194 Mo. 323; State v. Moxley, 115 Mo. 644.   (2)   The law is well settled in this State that a defendant can not sit by and permit a question to be answered, and then take the benefit of it if the same is favorable and have it stricken out of it is not favorable to him. State v. Harris, 199 Mo. 716; State v. Sykes, 191 Mo. 79; 1 Thompson on Trials, secs. 715-716. It should be remembered that defendant did not object to this evidence because the same was hearsay, but simply that it "did not prove or disprove any issue in the case," which was equivalent to saying that the same was irrelevant and immaterial. But this amounts to no objection at all, as this court has often said. State v. McLaughlin, 149 Mo. 27;   State v. Young, 153 Mo. 449.   (3)   In his motion for a new trial, defendant assigns error in the failure of the court to fully instruct the jury on all questions of law in the case necessary for them to consider, etc.   But no objections were made at the time, and no exceptions were saved at the time to the failure of the court to so instruct. This point has, therefore, been waived. State v. Urspruch, 191 Mo. 50; State v. Finley, 193 Mo. 211.   (4)   The evidence fully justified the jury in convicting defendant of murder in the sec-

ond degree; and the punishment assessed is very light. If the jury believed the State's evidence, and the verdict so affirms, then the verdict could not have been otherwise. (5) General threats were admissible against a defendant, even though at the time he made them he did not know the deceased. State v. Feeley, 194 Mo. 315. In the case at bar defendant knew the deceased, had had one or more difficulties with him at that church and during that protracted meeting. So, when the defendant predicted trouble on this night, the jury were justified in giving great weight to such evidence, especially in view of the war-like way that the defendant attended that religious gathering. The evidence for the State, as well as that for the defense, clearly brings this case within the rule laid down in a recent case, after reviewing the various authorities, that when the defendant and the deceased "by mutual understanding engage in the conflict and death ensues to either, the slayer will be guilty of murder." State v. Maupin, 196 Mo. 172; State v. Christian, 66 Mo. 147. This case, therefore, falls within the rule so often announced by this court, that where there is substantial evidence tending to show that defendant is guilty, this court will defer to the finding of the jury, as approved by the trial court, and not attempt to weigh the evidence. State v. Smith, 190 Mo. 706; State v. Payne, 194 Mo. 442; State v. Groves, 194 Mo. 452; State v. Williams, 186 Mo. 128; State v. Williams, 149 Mo. 496; State v. Swisher, 186 Mo. 8.

GANTT, J.—On the 21st day of August, 1905, the prosecuting attorney of Carter county filed an information, duly verified, charging the defendant with murder in the first degree. The offense was alleged to have been committed on the 20th day of August, 1905, the weapon used was a knife, and the name of the deceased was Alvy Chilton. At the September term,

1905, the State elected to prosecute on the charge of murder in the second degree. The defendant waived formal arraignment, pleaded not guilty, was tried and convicted of murder in the second degree; the punishment assessed was ten years in the penitentiary. After filing formal motions for a new trial and in arrest, which were overruled, defendant appealed.

The State's evidence tended to prove that a protracted meeting was being held in one of the churches in the town of Rogers Mill, near Brushy Creek, in Carter county, which meeting continued for some time. The defendant and the deceased were both young men and both attended the meeting on Saturday night. There was an unfriendly feeling existing between the young men, and on Saturday night the defendant stepped twice on the toes of the deceased. Each time the deceased requested him to keep off of his feet, and the defendant, each time he walked near the deceased, put his hand in his pistol pocket. The next morning, about eleven o'clock, the defendant was introduced by William Bowman to a Mr. Williams, when Mr. Williams asked the name of the creek, and the defendant said that it was the "Big Savage," and that trouble had been brewing there for some time and that it would probably happen there that night. That night about 7:30 the deceased and others were sitting in the church, services having just commenced, when the deceased went out, and walked to a well of the F. M. Rogers place, which was only a few feet from the church. In about five minutes the defendant got up and followed him over to the well. Several persons testified to seeing a difficulty between the two beginning with a fist fight and then hearing the deceased say, "You have cut me, you have killed me;" and the defendant say, "You tried to draw a pistol on me." The deceased walked a short distance away and fell, when the defendant said, "I guess, by God, he is fixed."

The defendant followed and made a motion like he was picking up something near the body of the deceased. A lantern was brought and a small pistol with one load in it was found some three or four feet from the body of the deceased and was picked up and exhibited to the crowd that gathered around. This pistol belonged to the defendant and contained one load, the cap of which had been snapped. The defendant left the scene of the killing and went to the home of Henry Johnson, about eight miles away, where he stayed all night. He told Mr. Johnson of the killing, said he intended to go and give himself up the next morning. Dr. T. W. Cotton, who was then coroner of the county, was called on Monday and held an inquest. He testified that he found eight wounds on the body of the deceased, six of which were not serious, but two of them were necessarily fatal. Most of the wounds were on the shoulder and back. One wound was under the left arm-pit and entered the chest cavity, and the other wound cut the cartilage of the second rib where it joins on the breast bone. All of the wounds were made with a knife, and the two last named were mortal. The doctor further testified that such wounds would produce, and, in his opinion, did produce a hemorrhage, from the effects of which the deceased soon died.

The defendant's evidence tended to prove that there was a very unfriendly feeling existing between the defendant and the deceased; and that on the night before the fatal difficulty the deceased followed the defendant around in the crowd near the church. At one time the deceased said to the defendant, "Damn you, don't you step on my toes any more." A little before dark on the evening of the homicide, one Lee Beavers and several other young men and boys were attending the evening service at said church, when Beavers climbed the fence and went to the well on the Rogers place. About the time he had drawn up a bucket of

water, the defendant and deceased and some others came up. A drink of water was passed around to them all, and they heard some other boys up the hillside some distance away using profane language and apparently having some trouble. The defendant said, "They are making enough racket to have a little hell." The deceased replied that he would like to have a little trouble that night; and the defendant then said, "I guess that is what you have been following me around for." At that, the deceased pushed his hat back, and the defendant began to back off and both commenced to strike at each other. The defendant was knocked to his knees, having been struck three times. The defendant drew his pistol, intending to use it to hit the deceased with it, but deceased jerked the pistol out of defendant's hands. The defendant called to the others to take the deceased off, saying he had a pistol. The deceased retorted that the defendant drew a knife. During the fight a pistol was heard to snap, which was defendant's pistol in deceased's hands. The defendant admitted cutting deceased several times, but claimed he did it to defend himself and only after he had backed off some twelve feet and after he had been blinded by the blows inflicted upon him by the deceased. After the cutting the deceased climbed over the fence and soon fell; and defendant said, "I guess he is fixed." A small pistol was found near the body of the deceased.

I. The information is sufficient both in form and substance to charge murder in the first degree, but the prosecuting attorney, with the permission of the court, elected to try the defendant for murder in the second degree. All the evidence in the case was admitted without any objection on the part of the defendant's counsel, save and except in one instance. During the cross-examination of the defendant's witness, Lee Beavers, the prosecuting attorney asked him if the defendant's father had

not told him, the witness, that he, the father, had tried to get the defendant not to go to the church that night, and the witness answered that he did. After this question had been asked and answered, the defendant moved to strike it out on the ground that it did not prove or disprove any issue in the case. The question was clearly objectionable on its face and the counsel for the defendant should have objected to the witness answering it. It is the settled law of this court that a party cannot sit by and permit a question to be answered and then take the benefit of it if the answer is favorable or have it stricken out, if unfavorable. [State v. Sykes, 191 Mo. l. c. 79; State v. Harris, 199 Mo. 716.] Moreover, the defendant did not object to this evidence on the ground that it was hearsay, but simply on the ground that it did not prove or disprove any issue in the case, which was no more than saying that it was irrelevant and immaterial. We are clearly of the opinion that this action of the court of itself did not constitute reversible error.

II. The instructions given by the court fully cover all the points of law arising upon the evidence. The court defined murder in the second degree and the technical terms used therein, as they have often been explained and approved by this court. The court also instructed on manslaughter, reasonable doubt, presumption of innocence, and the credibility of the witnesses. It is unnecessary to burden this opinion with the reproduction of the instructions, because they are in the often-approved form on each of these subjects. It is true that the defendant, in his motion for new trial, assigns as error the failure of the court to fully instruct the jury on all questions of law in the case, but independently of the fact that no objection was made at the time to such failure, if any, and no exception saved, we have been unable to conceive of any proposition regarding the instructions which was not covered.

by the court in its directions to the jury, and none have been suggested by the defendant or his counsel in this court; indeed, no brief has been filed in behalf of the defendant in this court.

III. The defendant was found guilty of murder in the second degree and we have read the record and the whole testimony in the case to ascertain if the evidence supported the verdict. The evidence discloses that there was a state of ill-feeling existing between the defendant and the deceased. There was testimony that on one occasion shortly before the fatal encounter, the defendant had apparently purposely trod on the toes of the deceased, and that on the morning before the homicide that night the defendant had uttered a threat to the effect that trouble had been brewing there for some time and would probably happen that night. The evidence further tended to show conclusively that the defendant went to the church that night armed with a pistol and a knife. It appears that after the young men had taken their seats in the church the deceased remarked to a companion that he was going out to get a drink of water, and left the church and went to a well in the yard of Mr. Rogers, who lived only a few steps from the church. On the part of the State the evidence showed that a few minutes after the deceased left the church, the defendant and a relative of his also left the church and went to this same well in the Rogers yard. After taking a drink of water, the defendant remarked, according to the evidence, that some young men were making enough racket to have a little hell. According to the evidence on the part of the defendant, the deceased replied that "he would like to have a little trouble that night." To which the defendant replied, "I guess that is what you have been following me around for," and thereupon they mutually began to strike each other with their fists. During this encounter, the testimony of the defendant shows that he drew

his pistol from his pocket, he did this not to shoot the deceased, but to use it as if it were a pair of knucks to strike with. The pistol was heard to snap, but no one except the defendant undertook to say that the deceased had the pistol in his hands. The defendant testified that the deceased wrenched the pistol from his, defendant's, hands, and that then he drew his knife and deceased snapped the pistol at him. The defendant then began to stab the deceased with his knife and inflicted eight wounds on his body, two of which, the coroner, who made the post-mortem examination, testified were mortal wounds. The evidence also showed that during the encounter, the deceased was heard to say, "You have cut me, you have killed me," and the defendant said, "You tried to draw a pistol on me." The evidence clearly showed that deceased was entirely unarmed, and that the pistol which was found on the ground where the deceased lay, was the property of the defendant. There was some testimony tending to show that the defendant himself dropped the pistol near the body of the deceased after he had fallen. Taking into consideration the ill-feeling that existed between the defendant and the deceased, the threat of the defendant that morning that the trouble would culminate that night, the fact that he had armed himself with a deadly weapon, his following the deceased from the church over to the well, the willingness with which he had entered into the fist fight, the fact that the deceased was totally unarmed and the testimony of the defendant that he drew the revolver on the deceased and that he afterwards stabbed him, we think it was a question for the jury to say whether or not the killing of the deceased by the defendant was malicious and the result of a premeditated purpose to kill. The evidence tended strongly to show that the fight at the well was entered into by the defendant and the deceased with a mutual understanding; that deceased contemplated

nothing more than a fist fight, we think is apparent
from all the circumstances in the case. But it is clear
that the defendant was acting with an undue advantage.
In State v. Christian, 66 Mo. 1. c. 147, this court said:
"It was held in State v. Underwood, 57 Mo. 40, that
when parties, by mutual understanding, engage in a
conflict, and death ensues to either, the slayer will be
guilty of murder. When the combat is the immediate
consequence of a sudden quarrel, and not an act of de-
liberation or agreement, it might be different; but even
in cases of this kind the conclusion of malice may be
reached, if the party killing began the attack with cir-
cumstances of undue advantage. When a party, under
color of fighting upon equal terms, uses, from the be-
ginning of the contest, a deadly weapon, without the
knowledge of the other, and kills, or when, at the begin-
ning, he prepares a deadly weapon, so as to have the
power of using it, in some part of the contest, and does
use it, and kills the other party with it, the killing will
amount to murder. [1 Russell on Crimes, 529, 531.]"
This statement of law was approved in the recent case
of State v. Maupin, 196 Mo. 1. c. 172. In view of all the
facts, we think it was for the jury to find whether the
killing was maliciously done. On the part of the de-
fendant, the court gave a full and liberal instruction
of self-defense, and told the jury that if they found and
believed from the evidence that at the time and the
place charged, the defendant was the aggressor and
provoked or sought or induced a difficulty with the de-
ceased but with no intent of killing him or of using upon
him a dangerous and deadly weapon, and during the
difficulty found himself hard pressed and found it nec-
essary to kill the deceased to save his own life, then
they might find him guilty of manslaughter in the
fourth degree and assess his punishment as provided
by the statute for that offense. The case, we think, was
fairly put to the jury. There was substantial evidence

to sustain their verdict. As the record is free from any reversible error, the judgment must be and is affirmed.

*Fox, P. J.,* and *Burgess, J.,* concur.